MARA W. ELLIOTT, City Attorney
GEORGE F. SCHAEFER, Assistant City Attorney
JENNY K. GOODMAN, Deputy City Attorney
California State Bar No. 177828
    Office of the City Attorney
    1200 Third Avenue, Suite 1100
    San Diego, California 92101-4100
    Telephone: (619) 533-5800
    Facsimile: (619) 533-5856
    Email: jgoodman@sandiego.gov

Attorneys for Defendants City of San Diego and Housing Authority
of the City of San Diego

# UNITED STATES DISTRICT COURT

| | |
|---|---|
| PATRICE BAKER, GLORIA COOPER, LESLIE DUDLEY, LETITIA FLYNN, KATHLEEN MACLEOD, EILEEN OSBORNE and KHALADA SALAAM-ALAJI, individuals, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SAN DIEGO, a municipal corporation, HOUSING AUTHORITY OF THE CITY OF SAN DIEGO, a public agency; SAN DIEGO HOUSING COMMISSION, a public agency; and DOES 1 to 50, inclusive, <br><br> Defendants. | Case No.  19cv01013 TWR (DEB) <br><br> **DEFENDANTS CITY OF SAN DIEGO AND HOUSING AUTHORITY OF THE CITY OF SAN DIEGO'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS** <br><br> Hearing Date: October 13, 2021 <br> Hearing Time: 1:30 p.m. <br> Courtroom: 3A <br> Judge: Hon. Todd W. Robinson <br> Trial Date: Not set <br> Magistrate: Hon. Daniel E. Butcher |

# I.

## INTRODUCTION

The City of San Diego's housing policies do not violate any fair housing or equal protection laws.  To meet the region's significantly lagging housing production, the City has enacted numerous policies which are designed to incentivize and increase housing, at all income levels, throughout the region.  None of these policies force developers to only build low-income housing in solely the Affected Communities.  Updating the City's community plans throughout the City, not just in the Affected Communities, provides increased capacity for all types of housing.  Market forces ultimately determine what type and where new development occurs within the framework of the increased density capacity.  Plaintiffs conflate increased density capacity with actual development of low-income and affordable housing commitments.  They are not the same.  Increased density capacity differs from community to community because they are at different stages of buildout.  Thus, in the beach communities where it has long been built out, there is less capacity to increase for any housing types whereas in less developed areas like the Affected Communities, there is more capacity.  To say that means the City is targeting the Affected Communities for low-income housing represents a gross misunderstanding of land use concepts.  Plaintiffs point to the community plan updates for the Affected Communities to argue that all of the increased capacity will result in low-income development in that area.  Plaintiffs ignore the community updates in other areas where the City is similarly increasing the density capacity to help alleviate the lack of housing production throughout the San Diego region.  For example, the City recently completed updates on community plans in the Mission Valley area, the Clairemont area and the Pacific

Beach area which added density capacity for more than 74,000 new units in those predominantly white areas.[1]

Plaintiffs' attempt to save the twice-rejected pleading deficiencies in the Second Amended Complaint fails because, once again, plaintiffs cannot establish, as they must, the robust causation between a specific City policy and the alleged disparate impact[2] nor have plaintiffs shown that the City's policies do not advance a legitimate purpose. The City's Expedite Program (which plaintiffs exclusively focus on in their opposition brief) serves the legitimate purpose of removing barriers to housing production for not only affordable housing but also for housing inventory within Transit Priority Areas and sustainable housing projects, among others. The Expedite Program is a City-wide policy and does not apply only in the Affected Communities as plaintiffs erroneously contend. As plaintiffs noted in their brief, this Court directed plaintiffs to identify a specific City policy that acts to force developers to build low-income or affordable housing solely in the Affected Communities. Plaintiffs' attempt to identify a policy that forces developers in this manner falls woefully short. No such policy exists. This Court can take judicial notice of the fact that the Expedite Program applies City-wide and not just within the Affected Communities. Moreover, the plaintiffs make much ado about the "Promise Zone" which overlays some of the Affected Communities but fail to show that this *federal* program (not a City program) which covers only a 6.4 square mile area in East Village and Barrio Logan contributes to or causes the alleged disparate impact in the Affected Communities. Plaintiffs' proposed remedy of stopping all

---

[1] See, 2020 Housing Inventory Report, p. 8 which can be accessed online at https://www.sandiego.gov/sites/default/files/2020_housing_inventory_report.pdf.

[2] Plaintiffs argue (ECF #81, p. 1:5-7) that the City concedes there is a disparate impact but that is not true. Whether a disparate impact exists is a factual issue outside the scope of this motion to dismiss. Instead, the City's motion focuses on the plaintiffs' legally insufficient pleading which renders a discussion of the factual "merits" of the claims moot.

CITY OF SAN DIEGO'S REPLY BRIEF

1 affordable housing projects in the City is a far more disastrous barrier to fair

2 housing than any alleged discriminatory practice plaintiffs attribute to the City.

3      Plaintiffs have not shown that their alleged fair housing and derivative equal

4 protection claims can survive the pleading stage of this litigation despite the

5 generous opportunities this Court provided for them to do so.  Therefore, the City

6 requests that the Court grant its motion to dismiss again but without further leave to

7 amend.

## II.

**THERE IS NO NEXUS BETWEEN THE CITY'S EXPEDITE PROGRAM
AND THE PURPORTED DISPARATE IMPACT WHICH DEFEATS
PLAINTIFFS' FAIR HOUSING VIOLATION CLAIMS**

11      The United States Supreme Court articulated two standards for courts to

12 evaluate when considering the viability of disparate impact claims.  (*Texas*

13 *Department of Housing & Community Affairs v. Inclusive Communities Project,*

14 *Inc.* (2015) 135 S. Ct. 2507 ("*ICP IV*").  These two standards are: (1) specifically

15 identify an "artificial, arbitrary and unnecessary" policy or practice that is a barrier

16 to housing; and (2) plead "statistical evidence demonstrating" that "defendant's

17 policy or policies [are] causing th[e] disparity." (Ibid.)  As discussed in the moving

18 papers in more detail, the Second Amended Complaint cannot satisfy either

19 standard.

20      Plaintiffs opposition brief focuses primarily on the City's Expedite Program

21 and argues that this policy forces developers to build only low income or affordable

22 housing in the Affected Communities.  "Instead of fulfilling the promise[3] of market

23 rate development, the City adopted an 'Expedite Program' that solely applied to the

---

[3] Plaintiffs repeatedly talk about the City's "promise" to build market rate development in the Affected Communities.  The community plan talks about the City's goals to achieve a 2/3 market rate development, but it never "promised" that it will take on that responsibility.  The City is not a developer. It provides guidelines and objectives through sound planning.  It does not build the actual housing.  Development is dictated by market forces within the framework of planning regulations and guidelines like community plans.  One cannot possibly know if this goal has been met until the community is fully built out.

Affected Communities. (ECF Doc. 78, ¶¶ 90-113) Through its 'Expedite Program,' the City was able to drive almost all low-income development to the Affected Communities." (ECF # 81, p. 1.)  While a motion to dismiss assumes the truth of properly plead factual allegations, the Court may also consider documents and public records which are referenced in the complaint of which the Court can take judicial notice. (*United States v. Ritchie*, 342 F. 3d 903, 908 (9th Cir. 2003) and *llig v. Union Electric Co.*, 652 F. 3d 971, 976 (8th Cir. 2011).)  Thus, if a plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim, the court can consider the document even if not attached to the complaint. (*Id.*)

Here, plaintiffs' Second Amended Complaint and their opposition brief makes extensive reference to the City's Expedite Program and argue that program forms the basis for their claims.  Therefore, this Court can consider the Expedite Program in its analysis.  The Expedite Program for Affordable, In-Fill Housing & Sustainable Buildings (Expedite Program) is a permit streamlining initiative that has been around for many years and was not first created in 2017 as plaintiffs allege.  The City's Development Services Department website contains substantial information about this program which can be accessed here:

https://www.sandiego.gov/development-services/news-programs/ahrep.

Information Bulletin 538 (Bulletin) summarizes the program which provides "expedited discretionary and ministerial permit processing for all eligible affordable, in-fill housing and sustainable development permits and building projects."  The judicially noticeable Bulletin can be accessed at https://www.sandiego.gov/sites/default/files/dsdib538.pdf.  Section III of the Bulletin describes nine categories of projects that are eligible for Expedite Program streamlining.  (Bulletin, pgs. 3-4.)  Notably, these categories apply City-wide.  One of the nine eligibility categories identified in the Bulletin is for commercial, residential or industrial projects proposed within the *federally designated* Promise

Zone. (Bulletin, Section III G.) Another one of the nine categories applies to projects located throughout the City in Transit Priority Areas. (Bulletin, Section III D). A developer can apply for expedited permitting through this program for any project (commercial or residential) that is deemed to fall within one of the nine eligibility categories. Thus, even a cursory review of the Expedite Program demonstrates that it applies City-wide and does not target or otherwise "force" developers to build low-income or affordable housing solely within the Affected Communities as plaintiffs charge.

Importantly, the number of units of affordable housing permitted under the Expedite Program constitutes a small fraction of the over 55,000 permits that the City processes each year. Between 2003 and 2017, the City approved a *total* of 3,049 affordable housing units City-wide through the Expedite Program. (See, Expedite Program Status Report, pgs. 3-4, on the website of the Expedite Program which can be accessed here: Annual%20Expedite%20Report%20Signed.pdf (sandiego.gov).) Similarly, in 2018, there were 1299 affordable units either approved or under review during the reporting period utilizing the Expedite Program. (See, Expedite Program  Annual Report for 2018 which can be accessed here: 2018_annual_report_expedite_program.pdf (sandiego.gov), p. 3.) Only 409 proposed affordable units were located in the Promise Zone with several other applications submitted under the Expedite Program for commercial development in the Promise Zone. Moreover, the Expedite Program applications and approvals for 2018 demonstrates that developers utilize this program for projects throughout the City and relatively few utilize it for low income or affordable housing development in the Promise Zone contrary to plaintiffs' claim that the Expedite Program "forces" developers to build only low-income units solely in the Affected Communities.

/ / / / /

/ / / / /

/ / / / /

1





2

3

4

5

6

7

8

9

10

11

12

13

14    Attachment 3 to the 2018 Expedite Program Annual Report (shown above)

15 provides a quick visual of the scope of the development utilizing this program.

16 This chart shows that the Expedite Program was used to process applications for a

17 wide variety of projects throughout the City including commercial and sustainable

18 projects and did not result in a concentration of only low-income projects in the

19 Affected Communities.  Indeed, the report shows that of the five applications

20 developers submitted in 2018 using the Expedite Program for projects in the

21 Promise Zone, four of them were for commercial projects.

22    Developers can take advantage of the permit streamlining for projects in all

23 nine council districts in the City.  There is no advantage offered through the

24 Expedite Program that is solely for the Affected Communities that cannot be

25 utilized in other areas (e.g. waiver of fees, permit review times, etc.)  It is simply a

26 gross misstatement of facts for plaintiffs to argue that the Expedite Program is in

27 any way responsible for any alleged disparate impact in the Affected Communities

28 given the irrefutable judicially noticeable evidence to the contrary.  Plaintiffs have

1    not shown any robust causal connection between the alleged disparate impact and

2    the Expedite Program.  There are no facts alleged which demonstrates that the

3    Expedite Program draws developers to build only low-income projects in the

4    Affected Communities rather than in White communities (or for that matter requires

5    developers to only build low-income housing).

6           Plaintiffs reliance on the federally designated Promise Zone also does not

7    advance their ability to show a robust causality between a City policy and an

8    alleged disparate impact.  The Promise Zone is a federally designated area, not a

9    City policy.  (See, The Promise Zone website which can be accessed here: About

10   Promise Zone San Diego (sdoppzones.com).)  The City partners with the federal

11   government to provide support and services to the communities in the Promise

12   Zone to improve quality of life for those residents and to accelerate revitalization.

13   (Ibid.)  The San Diego Promise Zone, one of only 22 in the nation, was selected, in

14   part, because it has the least affordable housing in the country.  While plaintiffs

15   claim that the City is concentrating affordable housing in the Promise

16   Zone/Affected Communities, HUD's selection of that area as a Promise Zone was

17   because of the lack of affordable housing available.  That alone undermines

18   plaintiffs' claim that there is some sort of concentration or forced development of

19   low-income housing occurring.  Indeed, one of the goals of the Promise Zone

20   designation is to increase access to affordable housing.  Plaintiffs' lawsuit and its

21   desire for a moratorium on building affordable housing in this area is the true

22   barrier to fair housing for these residents, not any City policy and would be contrary

23   to HUD's goal of increasing this community's access to affordable housing.

24          Plaintiffs continually, and erroneously, equate increased density with actual

25   construction.  For example, plaintiffs discuss the 2018 Housing Inventory Report in

26   the Second Amended Complaint and allege that because the Affected Communities

27   were allowed increased densities in their community plan updates, that means that

28

CITY OF SAN DIEGO'S REPLY BRIEF

1  the City doubled the low-income housing units in the Affected Communities

2  compared to the White neighborhoods.  (ECF #81, p. 5:18-23; ECF #78, ¶ 116.)

3       First, comparing increased density capacities does not accurately reflect the

4  percentage of residential density in any area and is comparing apples to oranges.

5  Areas which are not fully built out will be able to support higher density increases

6  than areas where it is nearly fully built out already.  For example, the beach areas

7  are nearly fully built out and already contain significant density capacity.  Just

8  because the updated community plans for beach areas do not show the same

9  number of increased density capacity as the Encanto area which still has a lot of

10 undeveloped or underdeveloped areas is not representative of the percentage or

11 proportion of residential capacity each area supports (not to mention differences in

12 geographical size which plaintiffs also ignore).

13      Second, increased density capacity is not akin to actual construction.  What is

14 ultimately built is dependent on numerous market factors.  The City provides

15 guidelines through its community plans and tries to anticipate what a future build

16 out will look like but plaintiffs cannot credibly argue that the City "doubled" the

17 low-income units in the Affected Communities just because it increased capacity

18 for all residential development.  Moreover, nowhere in the community plan or

19 otherwise does the City mandate that only low-income units be built within the

20 increased density capacity.  The increased density allows for a variety of residential

21 projects.  The exact type of project is dictated by market forces within the

22 framework of the community plans.

23      Plaintiffs have not shown that the City's Expedite Program policy,

24 implemented throughout the City and not just in Affected Communities, creates an

25 arbitrary or artificial barrier, would disproportionately effect minorities, is the direct

26 cause of disparate impacts, or in any other way established a direct relation between

27 the alleged injury and the alleged injurious conduct.  Increasing housing capacity

28 throughout the City is not akin to redlining as plaintiffs accuse and plaintiffs fail to

establish that alleged nexus.  It is not enough to just point to statistical disparities.
Plaintiffs must connect the challenged policies with the disparity.

### III.

### CONCLUSION

Plaintiffs failure to establish the required robust causation element dooms not only their fair housing claims under the FHA and FEHA, but also the derivative equal protection claim.  Accordingly, the Second Amended Complaint should be dismissed without further leave to amend.

Dated:  October 6, 2021                    MARA W. ELLIOTT, City Attorney

                                           By  *s/Jenny K. Goodman*
                                               Jenny K. Goodman
                                               Deputy City Attorney

                                           Attorneys for Defendants City of San
                                           Diego and Housing Authority of San
                                           Diego